IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KLEVINA K. DAJTI            CIVIL ACTION
                                   No. 20-cv-1483

       Plaintiff,

       v.

PENN COMMUNITY BANK        JURY TRIAL DEMANDED

       Defendant.

---

## AMENDED CIVIL ACTION COMPLAINT

Klevina K. Dajti ("Kelli" or "Plaintiff") initiates this dispute against Penn Community Bank ("PCB", "Bank" or "Defendant") to enforce rights under the civilrights laws of the United States and Pennsylvania, seeking all compensation, damages, costs, fees, expenses, punitive damages and equitable relief to which she is entitled.

### I.    INTRODUCTION

1.    In sum, Kelli, a three and one-half year employee of PCB's Bensalem Branch, served as Assistant Manager with a title change to Sales and Service Manager at PCB's

Bensalem Branch. She was unlawfully fired on 11/29/18 in the midst of her dealing with the care and treatment of her 4 year old son who was diagnosed in 2/2018 with high risk leukemia, and the need for expressing breast milk for her new born child (4/2018). With the onset of her son's illness and the birth of her son, she was subjected to harassment by former Branch Manager, K.M., solely because Kelli sought care for her seriously ill four year old son and sought reasonable break time to express breast milk for her new born nursing child in a clean and private location shielded from view and free from intrusion from PCB coworkers and the public. The indifference of her Branch Manager and the bank's Human Resources personnel to accommodations stemming from Kelli's motherly dedication constituted gross violations of Kelli's federal and state protected rights and entitlements including:

- **Pregnancy Discrimination Act of 1978 ("PDA")**, which amended Title VII of the Civil Rights Act of 1964, 42 U.S.C. ¶¶ 2000e *et seq.*, prohibiting discrimination on the basis of pregnancy, childbirth, or related medical conditions;

- **Pennsylvania Human Relations Act ("PHRA")**, 43 P.S. §§ 951 *et seq.*, prohibiting sex discrimination and considering discrimination on the basis of maternity or pregnancy to be a form of sex discrimination;

- **Title VII of the Civil Rights Act of 1964 ("Title VII")**, as amended, 42 U.S.C. ¶¶ 2000e *et seq.*, prohibiting discrimination on the basis of sex and considering the following to be forms of sex discrimination: (i) failure to make any meaningful accommodation for an employee's expressing breast milk during the workday as needed; (ii) impeding an employee in her using a private and secure location to express her breast milk; (iii)

2

disparate break time treatment; and (iv) retaliation against an employee for opposing, complaining and raising discrimination on the basis of sex (including pregnancy and lactation restrictions);

- **PHRA**, discrimination on the basis of sex and considering the following to be forms of sex discrimination: (i) failure to make any meaningful accommodation for an employee's expressing breast milk during the workday as needed; (ii) impeding an employee in her using a private and secure location to express her breast milk; (iii) disparate break time treatment; and (iv) retaliation against an employee for opposing, complaining and raising discrimination on the basis of sex (including pregnancy and lactation restrictions);

- **Americans with Disabilities Act ("ADA")**, 42 U.S.C. §§ 12101 *et seq.*, prohibiting associational disability discrimination against an employee who has an "association" with someone with a disability (42 U.S.C. §§ 12112(b)(4) and 12182(b)(1)(E)) and retaliation against an employee for opposing, complaining and raising discrimination on the basis of disability;

- **PHRA**, prohibiting associational disability discrimination against an employee who has an "association" with someone with a disability and retaliation against an employee for opposing, complaining and raising discrimination on the basis of disability; and

- **Family and Medical Leave Act ("FMLA")**, 29 U.S.C. §§ 2601 *et seq.* and 29 C.F.R. § 825.220, prohibiting retaliation against an employee who asserts FMLA rights or for raising an FMLA claim.

As the below factual allegations demonstrate, PCB's treatment and termination of Plaintiff's employment constitute violations of the PDA, ADA FMLA and PHRA, and that the asserted reasons for Plaintiff's termination are wholly pretextual and baseless.

## II. PARTIES

2. Plaintiff is an adult female and citizen of the United States.

3. PCB is a local community bank serving Lower, Middle and Upper Bucks County, Pennsylvania, as well as surrounding geographical areas with banking, insurance and investment services.

## III. JURISDICTION

4. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this State and this Judicial District are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) and its progeny.

5. The United States District Court for the Eastern District of Pennsylvania has

original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of civil rights. This Court also may maintain supplemental jurisdiction over the State law claims set forth herein pursuant to 28 U.S.C. § 1367(a) and Rule 8(a) of the Federal Rules of Civil Procedure because they are sufficiently related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

6. Venue is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district and Defendant is subject to personal jurisdiction in the Eastern District of Pennsylvania.

## IV. **PROCEDURAL REQUIREMENTS**

7. Plaintiff has exhausted all of the procedural and administrative requirements for proceeding with her claims of employment discrimination.

8. On February 19, 2019, within 300 days of the acts of which she complains, Plaintiff dual filed charges of employment discrimination against Defendant with the Equal Employment Opportunity Commission (which assigned to it Charge No. 530-2019-02049) and the Pennsylvania Human Relations Commission.

9. On approximately January 14, 2020, less than 90 days prior to the filing of this Complaint, the Equal Employment Opportunity Commission issued a Notice of Right

to Sue with respect to Plaintiff's charges.

## V.    **FACTUAL BACKGROUND**

10. Kelli was hired by PCB to work in its Bensalem Pennsylvania Branch in or about June 2015. She was hired by and at all relevant times was supervised by Branch Manager K.M. During a three year period in which Kelli worked under the supervision of K.M., 8 Branch employees quit (7 females and 1 male), 2 female Branch employees transferred to a different Branch, and 1 Branch employee was fired shortly after his wife gave birth to a second child.

11. During her tenure with PCB, Kelli maintained an unblemished record and received annual bonuses and salary increases.

12. In April 2018, Kelli took FMLA leave with the birth of her second child. Also, since her older son required weekly chemotherapy at Children's Hospital of Philadelphia every Thursday, Kelli requested and was allowed an additional four weeks of unpaid leave to care for both children.

13. She returned to work in August 2018 and did not miss a day's work thereafter except Thursdays for which she used her own accrued personal time off (PTO). At the time, Kelli still had about 160 hours of accrued PTO time remaining.

14. Thereafter, Kelli was pressured by Branch Manager K.M. to work more time including Thursdays and Saturdays thereby substantially interfering with the health care of her older child.

15. Also, Branch Manager K.M. commented critically on the birth of Kelli's second child and was highly uncooperative in making any meaningful accommodation for Kelli's expressing breast milk at the Branch during the workday as needed. Kelli thus was impeded in her using a private and secure location to express her breast milk and was not provided with a designated lactation room.

16. Kelli raised her concerns with the bank's Human Resources Department (HR) regarding the difficulties she was encountering in expressing her breast milk and attending to her son's medical needs. She received no meaningful accommodation from HR.

17. Rather, Branch Manager K.M., on about 11/14/18, lodged a formal Corrective Action notice against Kelli with which she disagreed.

18. Shortly thereafter on 11/19/18, Kelli met with the Defendant's HR Representatives to review her dispute with the issuance of the Corrective Action notice by K.M. During the course of that meeting, Kelli was asked by the HR Representatives about information that had been received by PCB from another Branch team member that K.M. wasperforming unauthorized transactions. In response, Kelli confirmed that Branch Manager K.M. without authorization had completed bank withdrawals from a customer's account on which K.M. was not an authorized user. This conduct by K.M. resulted in her separation of her employment with PCB.

19. Thereafter, HR instructed Branch personnel that if a customer asked to speak with K.M. they were to respond only that she was no longer with the Bank and ask how the inquiring customer can be helped. The Branch employees were further directed not to

provide any additional information regarding K.M.'s departure from the Bank including to neither confirm nor deny whether she had resigned or had been terminated.

20. According to PCB, K.M. called the Bank complaining that Kelli had provided a PCB customer with information regarding K.M.'s separation from employment from PCB. K.M. is said by PCB to have complained to the Bank that a second customer also was told by Kelli that K.M. had been fired.

21. PCB wrongly and misleadingly maintains that it conducted an investigation into K.M.'s complaints and allegedly claims to have spoken directly with at least one of those customers who is said to have confirmed that Kelli had done as K.M. complained. Yet, there were no discussion by PCB representatives with Kelli about those claims. Rather, two days later on 11/29/18, PCB pretextually and without basis and full and fair investigation summarily discharged Kelli allegedly for putting PCB at risk and jeopardizing its relations with its customers by her alleged disclosures to that customer.

22. Kelli denies having made any such comments about K.M. to any customer of the Bank. Rather, it is believed and therefore alleged that in a fit of revenge for Kelli's confirming that K.M. broke PCB security protocols, K.M. colluded with a customer to create the claim against Kelli.

23. It must be concluded that in view of PCB's inexplicable conduct and wholly lacking investigation, the reason for Kelli's discharge maintained by PCB was a pretext and was a consequence of Kelli's protected nursing needs and medical needs for her son.

24. Contrary to Defendant's assertion, once Kelli returned to work on August 6, 2018, PCB did not "adjust [her] work schedule to make it more convenient for [her] to take care

8

of [her] child". Rather, the PCB HR Department and K.M. knew Kelli's family and medical circumstances before her return but nonetheless gave her a difficult and troublesome time when Plaintiff's weekly day off was necessary. Plaintiff was expected by them to work every Saturday of the month in order to be able to take off a day during the week to take her son to the hospital for needed treatment.

25. Harsh, abusive and callous comments were frequently made by K.M. to Kelli, for example, when the two of them were preparing the work schedule, K.M. stated to her that "We don't have enough staff, do you really need off and can't your family members help?" Such comments were not even made in private but Branch staff also were present.

26. Kelli was not taking extended break time but took only the usual paid break that was taken prior to her maternity leave which was anywhere from 45 minutes to an hour.

27. Within Kelli's once per day 45 minute break, she had to drive home, finish her breast pumping session, eat her lunch and return to work on time. This barely left her the time to actually eat. Going home on break was Kelli's only option for breast pumping until K.M. complained to PCB that she could not handle the branch traffic herself during those break periods and wanted Kelli to start taking only a break time of 30 minutes per day. The demanded shorter break time made it impossible for Kelli to pump and to timely return to the Branch.

28. Also, when Kelli returned to work in August 2018, there was no designated lactation room.

29. In about January 2017, a former PCB Branch employee returned from her maternity leave after having her second child. She was asked by K.M. to pump her breasts outside

of the Branch premises. There was no designated lactation room in the Branch. This similarly situated employee lived in New Jersey and had a far commute so it was not possible for her to travel to her home to breast pump. The Bank used an old and filthy storage room in the Branch as the "designated lactation room" by putting up a portable room divider to hide the camera from capturing this other employee's pumping session. She complained to PCB about this situation several times but nothing was done by Defendant to alleviate this problem and her distress. The above described employee ended up quitting shortly thereafter.

30. Kelli did notify PCB's HR and Branch Manager K.M. several times during the Summer of 2018 that she was nursing her new born child and would be doing so until the baby turned one year old as had been a family tradition.

31. During the period when Kelli requested to extend her FMLA leave, she was asked by both K.M. and PCB HR if she would be breast pumping once she returned to work. Kelli unequivocally notified them that she would be breast pumping and would require a designated lactation room at the Branch. Upon her return to work, however, nothing was done about the breast feeding situation and Kelli was only given the option to go home to pump her breasts since there allegedly was no space in the Branch to add anything new, and the previous portable wall had been removed in about mid-2017.

32. Finally, after Kelli's many attempts to address this breast feeding dilemma with HR and K.M., HR representatives came to the Branch on 10/22/18 (her son's fifth birthday) to review the issue. At that time, Plaintiff met with Kirsten Palmieri, a PCB Human Resources representative, who stated "I was not aware of the situation and was not

informed of the details by [K.M.] as I should have been".

33. In or about the first week of November 2018, Defendant modified one of the two Branch bathrooms to be used as a breast pumping station. The contractor doing that work merely removed the toilet and a chair was added. During the period of construction, Kelli was forced to use the kitchen for her breast pumping.

34. That kitchen was a common area for all employees. Kelli would lock the door for about 20 minutes twice a day. Other colleagues were unhappy with not having access to the only refrigerator and kitchen in the Branch building while Kelli was breast pumping.

35. Were Kelli not to use this only option offered, she would have to punch out and go home for her pumping/lunch break which would leave her with about 35-36 hours of working time per week. To qualify for medical benefits as a full time employee, Kelli needed at least 37-38 work hours per week. Had there been a designated lactation room as Kelli requested there would have been no need for the delayed transformation of one of the restrooms and her having to use the only kitchen for breast pumping.

36. After the onset of her son's illness and the birth of her child, Kelli was put under extraordinary scrutiny by K.M. and was given and did more work just to make sure that she was given her day off when needed to help her son and his hospital needs.

37. K.M. was in charge of the Branch work schedule. She did not want Kelli taking more than one break per day, even though Kelli was breast pumping for milk for her newborn. This same once a day break rule applied even when there were 9-10 hour work days, due, for example, to overtime or meetings. In this regard, K.M. stated "I could not handle running the branch if [Kelli] were to take more than one break". This was stated in

11

front of the entire Branch staff several times during the staffs "morning huddle meetings".

38. K.M did not have children and frequently made negative and harassing comments about Kelli needing more breaks. This was a very painful experience on Kelli's body and psyche.

39. For about two months Kelli dealt with this harassment just to avoid retaliation from K.M. who controlled Kelli's scheduling needs.

40. K.M. frequently made comments to Kelli about breastfeeding not being a necessity. She stated, for example, "baby formula is enough for babies in this generation, and mothers who still breastfeed are very old-school and impractical".

41. Plaintiff was terminated on November 29, 2018, and during the meeting at which she was summarily terminated, she was told by HR Representative Georgeann McKenna, that "a bank customer called in to complain about [Kelli] informing the customer that K.M. had been fired or let go".

42. Kelli did not speak to anyone about the termination of K.M. Branch personnel were not given a reason by HR as to why K.M. was no longer with PCB. At all times, Kelli only informed inquiring customers that "K.M. is no longer with the bank and I am here to help".

43. Prior to Kelli's son getting sick and the birth of her second child, PCB never had any issues with Kelli or her performance. Kelli was given great customer ratings and terrific annual reviews. Yet, HR did not even question Kelli about her allegedly saying anything to customers about K.M.'s termination.

44. Kelli's termination was motivated by ill-intentions and discriminatory/retaliatory motives. Her elder son was diagnosed with high risk leukemia in February 2018 and Kelli

gave birth to her younger son in April 2018. She would typically work eight to nine or ten hour shifts while pregnant, go to the hospital to take care of her elder son during his most critical times of his illness, sleep at the hospital overnight and return to work at 8:30 a.m. During that two month period, Kelli did not take an entire day off. Rather, she would go to check her baby on stress monitors during longer unpaid lunch breaks. Kelli worked till her last day of pregnancy and started her maternity leave on the day of delivery. Kelli was committed to excellence, she took pride in helping her customers and she exceeded her goals. Defendant had been very happy with Kelli while she helped generate substantial commercial accounts and made a profit for PCB. However, PCB grew unhappy with her when the necessity of her caring for her son arose and lactation at the workplace became essential, and ultimately fired her because she was performing her motherly functions and had the "audacity" to complain when she was impeded by PCB in exercising her right to do so.

## COUNT I
## VIOLATIONS OF THE PDA AND TITLE VII

45. Plaintiff adopts and incorporates herein the preceding allegations of the Complaint, as if fully rewritten herein.

46. In the manner set forth above, Defendant discriminated against Plaintiff in violation of the PDA on the basis of her pregnancy.

47. The PDA prohibits discrimination on the basis of pregnancy, childbirth, or related medical conditions and considers the following to be forms of pregnancy discrimination:

(i) failure to make any meaningful accommodation for an employee's expressing breast milk during the workday as needed; (ii) impeding an employee in her using a private and secure location to express her breast milk; (iii) disparate break time treatment; and (iv) retaliation against an employee for opposing, complaining and raising discrimination on the basis of sex (including pregnancy and lactation restrictions).

48. Further, in the manner set forth above, Defendant discriminated against Plaintiff in violation Title VII on the basis of her sex and pregnancy.

49. In the manner set forth above and in violation of the PDA and Title VII, Defendant has engaged in willful and intentional sex and pregnancy discrimination and retaliation against Plaintiff and acted with malice and reckless indifference to Plaintiffs right under the PDA and Title VII to be free from discrimination based on her sex and pregnancy and to be free of retaliation.

50. As a result of the sex and pregnancy discrimination and retaliation intentionally inflicted by Defendant, Plaintiff has suffered damages including but not limited to lost earnings and benefits. As a result of the sex and pregnancy discrimination and retaliation inflicted by Defendants, Plaintiff has suffered emotional pain, anguish and suffering, ridicule, humiliation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT II
### VIOLATIONS OF THE PHRA

51. Plaintiff adopts and incorporates herein the preceding allegations of the

Complaint, as if fully rewritten herein.

52. In the manner set forth above, Defendant discriminated against Plaintiff in violation PHRA on the basis of sex, pregnancy and retaliation. The PHRA prohibits sex discrimination and considers discrimination on the basis of maternity or pregnancy to be a form of sex discrimination. The PHRA prohibits discrimination on the basis of pregnancy, childbirth, or related medical conditions and considers the following to be forms of pregnancy discrimination: (i) failure to make any meaningful accommodation for an employee's expressing breast milk during the workday as needed; (ii) impeding an employee in her using a private and secure location to express her breast milk; (iii) disparate break time treatment; and (iv) retaliation against an employee for opposing, complaining and raising discrimination on the basis of sex (including pregnancy and lactation restrictions).

53. In the manner set forth above and in violation of the PHRA, Defendant has engaged in willful and intentional sex and pregnancy discrimination and retaliation against Plaintiff and acted with malice and reckless indifference to Plaintiff's right under the PHRA to be free from discrimination based on her sex and pregnancy and to be free of retaliation.

54. As a result of the sex and pregnancy discrimination and retaliation intentionally inflicted by Defendant, Plaintiff has suffered damages including but not limited to lost earnings and benefits.

55. As a result of the sex and pregnancy discrimination and retaliation inflicted by Defendant, Plaintiff has suffered emotional pain, anguish and suffering, ridicule,

humiliation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT III
## VIOLATIONS OF THE ADA

56. Plaintiff adopts and incorporates herein the preceding allegations of the Complaint, as if fully rewritten herein.

57. In the manner set forth above, Defendant discriminated against Plaintiff in violation of the ADA. The ADA prohibits associational disability discrimination against an employee who has an "association" with someone with a disability (42 U.S.C. §§ 12112(b)(4) and 12182(b)(1)(E)) and retaliation against an employee for opposing, complaining and raising discrimination on the basis of disability, to wit, her son's cancer condition. This law prohibits discrimination against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." Thus, a parent has a relationship with a child with a disability. 42 U.S.C. § 12182(b)(1)(E)(Title III); 28 CFR § 35.130(g). Kelli was a "qualified individual" within the meaning of the ADA.

58. In the manner set forth above and in violation of the ADA, Defendant has engaged in willful and intentional associational disability discrimination sex and retaliation against Plaintiff and acted with malice and reckless indifference to Plaintiff's right under the ADA to be free from discrimination based on her association with her son during his cancer disability condition.

59. As a result of Plaintiff's association with her son during his period of high

16

risk leukemia, Defendant intentionally retaliated against Plaintiff who consequently suffered damages including but not limited to lost earnings and benefits.

60. As a result of the Plaintiff's association with her son during his period of high risk leukemia, and the retaliation inflicted by Defendant, Plaintiff has suffered emotional pain, anguish and suffering, ridicule, humiliation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## COUNT IV
## VIOLATIONS OF THE FMLA

61. Plaintiff adopts and incorporates herein the preceding allegations of the Complaint, as if fully rewritten herein.

62. In the manner set forth above, Defendant violated the FMLA and 29 C.F.R. § 825.220, which prohibits retaliation against an employee such as Plaintiff who asserts FMLA rights or for raising an FMLA claim.

63. In the manner set forth above, and in violation of the FMLA, Defendant has engaged in a willful and intentional retaliation against Plaintiff who asserted her FMLA rights or for raising an FMLA claim, and acted with malice and reckless indifference to Plaintiff's right under the FMLA to be free of retaliation for asserting FMLA rights or for raising an FMLA claim.

64. As a result of Defendant's retaliation against Plaintiff, she has suffered damages including but not limited to lost earnings and benefits.

65. As a result of Defendant's retaliation against Plaintiff, she has suffered

emotional pain, anguish and suffering, ridicule, humiliation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**WHEREFORE,** Plaintiff prays that thisCourt enter an order providing that:

a) Defendant is to be permanently enjoined from discriminating/retaliating againstPlaintiff on any basis forbidden by Title VII, PHRA, ADA, FMLA and other applicable federal and state law;

b) Defendant is to promulgate and/or adhere to a policy prohibiting discrimination/retaliation in the workplace, and ensure this policy is fairly and adequately enforced;

c) Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff wholefor any and all pay and benefits Plaintiff would have received had it not been forDefendant's illegal actions, including but not limited to back pay, front pay, interest, salary, pay increases, bonuses, insurance, benefits, training, promotions, lost 401Kor retirement benefits, and seniority;

d) Plaintiff is to be awarded compensatory damages for the mental anguish, emotionaldistress, pain and suffering caused by Defendant's actions;

e) Plaintiff is to be awarded punitive damages as allowed by the Title VII in an amountbelieved by the Court or trier of fact to be appropriate to punish Defendant for itswillful, deliberate, malicious, reckless and outrageous conduct, and to deter Defendant or other employers from engaging in such misconduct in the future;

f) Plaintiff shall receive an additional amount as liquidated damages, pursuant to the FMLA;

g) Plaintiff is to be accorded equitable or injunctive relief as allowed by applicable law;

h) Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees;

i) This Court should grant any and all other such legal or equitable relief as it deemsnecessary, just, and appropriate;

## PLAINTIFF'S DEMAND FOR A JURY TRIAL AND ONGOING JURISDICTION OF THIS COURT

All of the claims of Plaintiff are to receive a trial by jury to the extent allowed by applicable law. This demand has also been endorsed on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b); This Court should maintain jurisdiction over the instant action to ensure full compliance with its Orders therein until such time as it is satisfied that its Orders and dictates have been complied with in full by Defendant.

Respectfully submitted,

WEINSTEIN LAW FIRM, LLC

/s/ Marc E. Weinstein, Esquire
Marc E. Weinstein
Identification No. 79474
500 Office Center Drive, Suite 400
Fort Washington, PA 19034
267.513.1942 (tel)
marc@meweinsteinlaw.com

and

PENTIMA LAW FIRM, PLLC

/s/ Vincent J. Pentima, Esquire
Vincent J. Pentima
Identification No. 18523
30 Rock Hill Road
Bala Cynwyd, PA
484.436.2119 (tel)
vjp@pentimalaw.com

Dated: August 12, 2021